## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Jeffrey Machado**

    v.

**Daniel P. Driscoll,**
**Secretary of the Army**[1]

Case No. 1:25-cv-42-PB-TSM
Opinion No. 2026 DNH 029

## MEMORANDUM AND ORDER

This case arises from the Army Discharge Review Board ("the Board")'s refusal to upgrade its characterization of Jeffrey Machado's service in the Army from "Other Than Honorable" to "Honorable."

Since voluntarily separating from service in lieu of court-martial in 2014, Machado has sought to have his discharge upgraded in light of his service-connected diagnoses with post-traumatic stress disorder ("PTSD") and traumatic brain injury ("TBI"). In three applications to the Board, he has unsuccessfully contended that his misconduct leading to his discharge was attributable to these mental health conditions, which are increasingly afforded special weight by federal law and military policy.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Army Daniel P. Driscoll is automatically substituted for former Acting Secretary Mark F. Averill. See Fed. R. Civ. P. 25(d).

Reviewing the Board's most recent denial, I conclude that it overlooked key arguments and evidence that Machado marshalled in his favor and failed to give liberal consideration to Machado's mental health conditions as compelled by statute. These errors render the Board's decision arbitrary and capricious, requiring me to set it aside and remand it for further proceedings.

## I.  BACKGROUND

### A.    Policy Framework

The United States military's practices related to personnel who separate from service with mental health conditions have significantly evolved over the last fifteen years. Before delving into the facts of Machado's discharge, it is helpful to trace those developments.

When a servicemember separates from the military, he or she receives a "Certificate of Release or Discharge from Active Duty," also known as a Form DD-214. Dep't of Def., Form DD-214. On the unabbreviated version of this form, the servicemember is assigned one of five designations characterizing his or her discharge: "Honorable," "General Under Honorable Conditions," "Other Than Honorable," "Bad Conduct," and "Dishonorable."[2]

---

[2]    There are other fields on Form DD-214 which correspond with or elaborate on the servicemember's discharge characterization, including the "Separation Code," "Reentry Code," and "Narrative Reason for Separation." Dep't of Defense, Form DD-214.

Id. While the precise consequences vary by discharge, any characterization other than "Honorable" can adversely affect a servicemember's eligibility for certain veterans' benefits. See, e.g., 32 C.F.R. § 3.12(a) ("[P]ension, compensation, or dependency and indemnity compensation is payable" for service "terminated by discharge or release under conditions other than dishonorable.").

Within fifteen years of separation, a former servicemember may obtain review of his or her discharge characterization from a military review board. See 10 U.S.C. § 1553. For the Army, these reviews are performed by the Board. See 32 C.F.R. § 581.2. In weighing an application for review, Department of Defense regulations require the Board to assess the "[p]ropriety" and "[e]quity" of the servicemember's discharge, "giv[ing] full, fair, and impartial considerations to all applicable factors." Id. § 70.9. A discharge may be improper, for example, if "[t]here exists an error of fact, law, procedure, or discretion associated with the discharge at the time of issuance." Id. § 70.9(b)(1)(i). A discharge may likewise be inequitable, meanwhile, if "[t]here is substantial doubt" that the veteran "would have received the same discharge" if subsequently enacted policies or procedures "had been available" at the time. Id. § 70.9(c)(1)(ii). To explain its conclusions, the Board must issue a "decisional document" that, in relevant part, "set[s] forth" the evidence "contradictory" to its decision and "explain[s] why the

information relied upon was more persuasive than the information that was rejected." Id. § 70.8(e)(3)(ii)(B)(2), (6)(ii)(B)(2).

In September 2014—just as Machado was separating from the Army— then-Secretary of Defense Chuck Hagel issued a memorandum (the "Hagel Memorandum"[3]) responding to an influx of such applications from Vietnam War veterans who sought discharge upgrades based on PTSD diagnoses that were not recognized at the time of their service. The Hagel Memorandum establishes guiding principles for review boards reviewing these and similar applications. Principally, it directs that "[l]iberal consideration will be given" where service records "document one or more symptoms which meet the diagnostic criteria of [PTSD] or related conditions." Hagel Memorandum ¶ 1.

The Department of Defense elaborated on this standard in a 2017 memorandum issued by then-Acting Under Secretary of Defense for Personnel and Readiness A.M. Kurta (the "Kurta Memorandum"[4]). That

---

[3]     Memorandum from Charles T. Hagel to Secretaries of the Military Departments, Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder (Sept. 3, 2014).

[4]     Memorandum from Anthony M. Kurta to Secretaries of the Military Departments, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment (Aug. 25, 2017).

memorandum created a four-step framework (the "Kurta Questions") for assessing discharge-upgrade requests "based in whole or in part on matters relating to mental health conditions, including PTSD [and] TBI." Kurta Memorandum ¶¶ 2, 3. Specifically, the Kurta Memorandum requires review boards to address four questions:

> [(1)] Did the veteran have a condition or experience that may excuse or mitigate the discharge? [(2)] Did that condition exist/experience occur during military service? [(3)] Does that condition or experience actually excuse or mitigate the discharge? [(4)] Does that condition or experience outweigh the discharge?

Id. ¶ 2. Consistent with the Hagel Memorandum, the Kurta Memorandum emphasizes that in conducting each inquiry, "[l]iberal consideration will be given" to servicemembers who base their applications on PTSD or TBI diagnoses. Id. ¶ 3. The memorandum goes on to explain that PTSD and TBI "impact veterans in many intimate ways" and "inherently affect one's behaviors and choices[,] causing veterans to think and behave differently than might otherwise be expected." Id. ¶ 26(d), (e). Significantly, the memorandum states that while "[l]iberal consideration does not mandate an upgrade" in discharge characterization in every case, "[r]elief may be appropriate" even for "significant misconduct sufficiently justified or outweighed by the facts and circumstances." Id. ¶ 26(k).

5

In a third memorandum issued in 2018 (the "Wilkie Memorandum"[5]), then-Under Secretary of Defense for Personnel and Readiness Robert L. Wilkie added a set of guiding principles for review boards to apply when considering these and other equity-based applications for relief. In relevant part, the Wilkie Memorandum identifies several kinds of post-service evidence that review boards should consider. Wilkie Memorandum ¶¶ 6(a), (7). These include, for example, a servicemember's "[a]cceptance of responsibility, remorse, or atonement for misconduct," "[m]eritorious service in government or other endeavors," "evidence of rehabilitation," and "[c]haracter references." Id. ¶ 7(g), (k), (l), (p).

Throughout this period, Congress instituted similar reforms, codifying the "liberal consideration" standard in the statute governing discharge reviews in 2016 and amending it in 2017. See National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2000, 2123-24 (codified as amended at 10 U.S.C. § 1553(d)(3)); National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, 131 Stat. 1283, 1379 (amending 10 U.S.C. § 1553(d)(3)(a)(ii)). With these amendments, the

---

[5]    Memorandum from Robert L. Wilkie to Secretaries of the Military Departments, Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Regarding Equity, Injustice, or Clemency Determinations (July 25, 2018).

statute provides that, for a former servicemember "whose application for relief is based in whole or in part on matters relating to [PTSD] or [TBI] as supporting rationale," a review board must "review the case with liberal consideration to the [servicemember] that [PTSD] or [TBI] potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the member's discharge or dismissal." 10 U.S.C. § 1553(d)(3)(A)(ii), (B).

Finally, a recent court-ordered development bears mentioning. In 2016, two Army veterans brought a class action against the Secretary of the Army on behalf of a class of Army veterans, ultimately asserting that the Board had disregarded the statutory and administrative authorities above in arbitrarily denying discharge upgrades to former servicemembers with diagnoses of PTSD and PTSD-related conditions. See Kennedy v. Whitley, 539 F. Supp. 3d 261, 263-64 (D. Conn. 2021). In 2021, the court approved a settlement agreement between the parties in that case, which in part provided for renewed review of applications that had been denied despite raising issues related to these mental health conditions. See id. at 267.

### B.    Machado's Service & Discharge

Machado enlisted in the Army as an infantryman in November 2010. AR 181.[6] Following his initial training, Machado was stationed with the 1st Armored Division at Fort Bliss in El Paso, Texas. Id. at 149.

In December 2012, the 1st Armored Division deployed to Afghanistan in support of Operation Enduring Freedom. AR 603-04. There, Machado served on his company's Intelligence Support Team, requiring him to rove with patrols to collect and verify battlefield intelligence. Id. at 516. His unit used this information to interdict emplacement of improvised explosive devices ("IEDs") and generally inform troop movements and responses. Id. at 291. Machado received multiple awards for his service in this role, id. at 288-91, and in April 2013, he re-enlisted. Id. at 158, 177.

The following summer, two events occurred that laid the foundation for these proceedings. First, in May 2013, Machado's company responded to render emergency aid when its sister company detonated multiple IEDs in a nearby village, killing several soldiers and making double- and triple-amputees out of many more. Id. at 518. On an ensuing patrol in the village, members of Machado's company detonated yet another IED, injuring four

---

[6]    I cite to the administrative record, which the government filed conventionally. See Doc. 14; Doc. 18.

more soldiers. Id. Amidst the chaos from the second explosion, Machado and a fellow soldier remember him running into the blast zone to help rescue the wounded survivors. Id. at 518, 527. Machado spent the next eight days collecting soldiers' remains. Id. at 519.

Then, in June 2013, Machado recalls collapsing from dehydration on his way to a morning meeting, striking his head on the bumper of a military vehicle as he fell. Id. at 517. Machado attests that he "was unconscious for about ten minutes and woke up on a litter, being carried into the aide station." Id. For the days that followed, Machado says he "felt fuzzy, couldn't concentrate, and was slow to react." Id.

After these events, Machado's behavior shifted. As he describes it, over that summer, he became a "cold, bitter person" with newfound contempt towards Afghans. Id. at 503. He remembers exhibiting such a short temper that a senior officer "had to step in and monitor his behavior towards them" after an incident in which he pulled his knife on an Afghan police officer. Id. at 520. He also acted more recklessly, sometimes electing to "stand on found munitions just to get a closer picture of serial numbers, for example." Id. at 519. Throughout this period, he recalls that "sleep was not an easy thing" for him. Id. Yet, by all accounts, he did not receive medical treatment for these symptoms while deployed.

9

Machado's unit returned to Fort Bliss in August 2013. Id. at 520. Three days later, he married his girlfriend, who he had met shortly before he deployed and carried on a long-distance relationship with from Afghanistan. Id. Now in her company, Machado's aberrant behavior persisted. He reported going into an "internal frenzy" upon hearing gunshots, sometimes "waking up with a gun in [his] hand," and intrusively reliving experiences from his tour of duty. Id. at 503. He felt "depressed and suicidal" around this time, eventually asking a friend to store his firearms after "a few failed attempts to take [his] own life." Id. at 520. But when he reported feeling "jumpy and paranoid" to an Army doctor upon his return, he was told that his "feelings were normal and that they would go away in a month." Id.

In January 2014, Machado was reassigned to the 25th Infantry Division out of Schofield Barracks in Oahu, Hawaii. Id. at 149. There, he continued to feel "stressed, anxious, and depressed," and he gained weight. Id. at 520. His suicidal ideation worsened, and his wife grappled with her own mental health challenges. Id. Their young marriage spiraled over the following months, even as Machado sought treatment and the couple went to marriage counseling. Id.

The record is ambiguous as to what transpired next. As Machado recounts, he engaged in three episodes of erratic behavior.

10

First, he recalls an incident in which he tried to commit suicide by driving off the side of a highway with his wife in the car. Id. at 521. When she reached for the steering wheel, Machado says he "grabbed her and pushed her away." Id. Later, having "snapped . . . out of" his "trance," Machado continued to drive home. Id. When Machado's wife asked him to let her out of the car, he refused in favor of completing the trip. Id.

Second, Machado describes an argument with his wife in which she "began throwing [their] belongings off of their shelves, to the ground and into trash bags." Id. Machado states that he "tried to turn her towards facing [him] by grabbing her arm." Id. According to Machado, this "caused her to lose her balance and hit her lip." Id.

Third, Machado acknowledges that he twice attempted to communicate with his wife in violation of a military protective order while psychiatrically hospitalized. Id. In one case, he asked another soldier to "text her to make sure that she was okay," a request he characterizes as motivated by worry for her wellbeing because she had previously threatened to kill herself. Id. In the other case, he says that his wife had texted him "a picture of her hand with no wedding ring," informed him that she had sold it, and threatened to divorce him if he did not respond, so he did. Id.

Machado proactively reported the first two of these episodes to his commanding officer. Id. After the third, having violated the Army's protective

11

order, Machado was transferred to the brig at Joint Base Pearl Harbor for pre-trial confinement. Id. Although first transferred on June 4, 2014, he was immediately hospitalized again for suicidal ideations. Id. at 999. After he was discharged on June 10, he was transferred back to the brig, where he claims that he spent his first month in solitary confinement. Id. at 521. While incarcerated, Machado underwent two physical examinations and numerous individual psychotherapy sessions. Id. at 1659-70.

At some point, Machado was charged with violating three provisions of the Uniform Code of Military Justice ("UCMJ"). Id. at 153-55. Taken at face value, the charges describe unsettling conduct that is far more extreme than Machado's telling. The first charge, under Article 128 of the UCMJ, alleged a wide array of domestic violence dating back to September 2013, before Machado transferred to Hawaii. Id. at 153. Across various instances, the Army asserted that Machado "grab[bed]" his wife and "dragged her"; "sh[ook] her, pin[ned] her to a couch, and punch[ed] her in the head"; "grab[bed] [her] by the head and press[ed] his thumbs against her eyes"; "str[uck] [her] in the side of the face with his arm, grab[bed] the back of her neck with his hand, and pull[ed] her toward him"; "push[ed] her face into a door"; "str[uck] her in the throat"; and "shove[d]" her "down onto a mattress with his hands." Id. The second charge, under Article 134, alleged that Machado made several threats to his wife over the same time period, including statements that he

12

would "kill her by putting her in a bathtub with a toaster"; "injure her by hitting her in the head with a hammer"; "kill her if she ever left him"; and "injure her by shoving a broom handle into her vulva and anus." Id. at 154. That charge also alleged that Machado had "confine[d] and h[eld]" his wife "against her will" and, in one case, "pointed a handgun at his head in [her] presence," threatening to kill himself if she left him. Id. The third charge, under Article 90, concerned Machado's violations of the protective order. Id. at 154-55. That charge purported to identify three unauthorized communications he made to her after the order was issued. Id.

Facing these charges, Machado requested discharge in lieu of trial by court-martial in September 2014. Id. at 758. In the process, Machado acknowledged his guilt of "some of the charges and/or specification[s] or a lesser included offense."[7] Doc. 1 at 15 (alteration in original). His request was approved, resulting in the charges' dismissal without specific findings by court-martial. See AR 153-55. Machado was ultimately discharged from duty with an "Other Than Honorable" characterization. Id. at 758.

After his discharge, Machado at first returned to Texas with his wife but soon separated from her, later moving alone to Massachusetts. Id. at 522.

---

[7]    The letter containing this acknowledgment is not in the administrative record, and neither party has provided it, so it remains unclear to which specific allegations it pertains, if any.

With the help of a veterans' outreach program, he eventually obtained mental health treatment through the Red Sox Foundation's Home Base Program at Massachusetts General Hospital, where he was diagnosed with major depressive disorder, PTSD, and TBI. Id. at 34, 536. In 2016, based on a review of his treatment records, the Department of Veterans Affairs ("VA") found Machado's discharge "honorable for VA purposes" because he was "insane at the time" of his misconduct, in turn rendering him eligible for VA benefits notwithstanding his unfavorable discharge characterization. Id. at 52-53. In 2017, the VA further determined that his PTSD and TBI diagnoses were service-connected and assigned him a 100-percent disability rating, enabling him to receive monthly VA benefit payments. Id. at 57-58.

Today, Machado is remarried and lives in New Hampshire, where he owns a home and lives with his wife. Id. at 34. He receives mental health treatment multiple times per week, which has allowed him to better manage his symptoms of PTSD. See id. at 34-35. His wife concurs, attesting that he is now "a lot calmer" and "triggered less frequently." Id. at 40. In his free time, Machado volunteers for multiple veterans' causes and helps to set up coffee socials for veterans through the same organization that connected him to the Home Base Program many years ago. Id. at 36.

C.     **Procedural Background**

Machado first applied for review of his discharge in May 2016. Id. at 481-97. In that application, Machado argued that his "Other Than Honorable" discharge was inequitable in light of his mental health conditions and record of post-service rehabilitation. Id. at 489-91, 495-96. He also argued that his discharge was improper due to the Army's asserted failure to comply with the procedural requirements for administrative separations imposed by 10 U.S.C. § 1177. Id. at 492. Attached to his application were several exhibits, including a medical report prepared by psychologist Dr. Sandra A. Dixon, Psy.D., diagnosing him with major depressive disorder and PTSD; correspondence from Mass General confirming the same; copies of reports from mental status evaluations that the Army performed prior to his discharge in May and June 2014; a copy of a report describing his admission to an El Paso hospital for suicidal ideation in October 2014; letters of support from family, friends, and servicemembers who deployed with him to Afghanistan; and other Army personnel records. Id. at 502-679. Based on this evidence, Machado asked the Board to upgrade his discharge characterization to "Honorable" and make related revisions to his Army records. Id. at 483, 497. The Board denied his application in July 2018. Id. at 463-70.

Machado reapplied for review of the Board's denial later that year. Id. at 292. In his second application, he expressly incorporated by reference the

15

arguments and exhibits from his 2016 application and supplemented them with the VA's favorable intervening eligibility and service-connection decisions; a sworn affidavit from Dr. Dixon affirming Machado's earlier PTSD diagnosis and explaining why "[t]he conduct that led to his discharge was" a "manifestation of PTSD symptoms"; and a copy of an article examining the relationship between PTSD diagnoses and intimate-partner violence ("IPV") in military families. Id. at 286-315, 431-48. Machado testified in person before the Board in support of his reapplication. Id. at 286. In a decision issued in July 2019, the Board again denied his request. Id. at 278-85.

Two years later, pursuant to the Kennedy settlement detailed above, the Board notified Machado that it would automatically reconsider his application once more. Id. at 43-45. Machado availed himself of the opportunity to submit additional evidence, supplying affidavits from him and his wife discussing his progress with mental health treatment, his volunteer work with regional veterans' organizations, and the stability of their relationship. Id. at 34-41. He also submitted a new letter from a licensed social worker verifying his "consistent" and "motivated" engagement with regular psychotherapy. Id. at 76. In a supplemental brief to the Board, Machado continued to rely heavily on Dr. Dixon's assessments to argue that his symptoms of PTSD mitigate his discharge and outweigh his misconduct, thus satisfying Kurta Questions 3 and 4. Id. at 24-27; see Kurta

16

Memorandum ¶ 2. He also again emphasized the evidence of his rehabilitation, arguing that it merits relief under the Wilkie Memorandum. AR 28-29. And again, as in 2019, Machado expressly "incorporate[d] [his prior] submissions by reference," including the evidentiary record and arguments in prior briefs prepared by counsel. Id. at 16.

The Board issued its third and final decision in June 2022. Id. at 2-11. The decision is primarily descriptive, summarizing Machado's service and discharge history, the law and policies governing the Board's review, and Machado's arguments. See id. at 2-9. In its two-page "Discussion and Determination," the Board sequentially addresses the four Kurta Questions and responds to some of Machado's contentions. Id. at 9-10.

In response to Kurta Questions 1 and 2, the Board answers affirmatively, acknowledging that Machado's PTSD and TBI diagnoses are conditions that could mitigate the misconduct leading to his separation and that those conditions are service-connected. Id. at 9. On Question 3, however, the Board demurs, stating:

> It is the opinion of the Board's Medical Advisor that there are no mitigating Behavioral Health conditions for applicant's basis for separation. Applicant's severe physical assaults that were the basis for applicant's separation, are not part of the natural history or sequelae of PTSD, TBI or other behavioral health conditions, and, as such, are not mitigated under Liberal Consideration.

Id. Likewise, on Question 4, the Board rules against Machado:

17

> Despite the Board's application of liberal consideration, the Board concurred with the opinion of the Board's Medical Advisor, a voting member, that the available evidence did not support a conclusion that any of the applicant's medical conditions of TBI/PTSD outweighed the unmitigated basis for applicant's separation— repeated assaults, threats, and disobeying a lawful no-contact order.

Id. Given its adverse conclusions on Kurta Questions 3 and 4, the Board once again declined to upgrade Machado's discharge characterization. Id. at 11.

In January 2025, Machado sued the Secretary of the Army in the Secretary's official capacity, asserting that the Board's decision violated the Administrative Procedure Act ("APA") and his constitutional due process rights. Doc. 1 at 20-24. Machado asks this Court to direct the Board to upgrade his discharge as requested or, in the alternative, set aside its decision and remand for further proceedings. Id. at 25. Before me now are the parties' cross-motions for summary judgment.

## II. STANDARD OF REVIEW

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). This review is akin to that of an appellate court; my task is "not to determine whether a dispute of fact remains," but instead to assess the lawfulness of an agency's decision under the rubric of the APA. See id.; 5 U.S.C. § 706(2). The decisions of military review boards are agency decisions subject to that familiar standard

18

of review. See Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024); see also

Chappell v. Wallace, 462 U.S. 296, 303 (1983).

Under the APA, I may only "set aside" an agency's decision "if that

decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law,' or if the decision is 'unsupported by substantial

evidence.'" Mahoney, 99 F.4th at 34 (quoting Sasen v. Spencer, 879 F.3d 354,

359-60 (1st Cir. 2018)). This standard is "highly deferential," meaning that I

"must uphold" such a decision so long as it is "free from legal errors and is

supported by any rational review of the record." Id. (citation modified).

Absent legal error, I cannot "substitute [my] judgment for that of the agency."

Bos. Redevelopment Auth., 838 F.3d at 47 (quoting Associated Fisheries of

Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)).

### III.  ANALYSIS

As a preliminary matter, the government contends that in reviewing

Machado's case, I should assume that the Board's 2022 decision implicitly

incorporated the reasoning of its 2018 and 2019 decisions. However, the

government does not point to any statement to that effect in the 2022

decision itself—nor could it, as that decision makes no reference to the prior

two. See AR 1-11. Rather, the government relies on Machado's express

incorporation of his prior submissions to the Board when he supplemented

19

the record pursuant to the Kennedy settlement, see id. at 16, to argue that I can infer the same of the Board.

While that approach might evoke a sense of parity, to impute the same incorporation by reference to the Board's reasoning as to Machado's evidentiary submissions would directly undermine the essential bargain of the Kennedy settlement and frustrate the Board's related promises to class members. The Kennedy settlement requires the Board, for each class member, to newly "review the discharge applications" and "reconsider the individual applicant's case." 539 F. Supp. 3d at 267. Consistent with that obligation, the Board made clear in its letter notifying Machado of the settlement that it would "take a fresh look at" his application and "send [him] its decision" based on that review. AR 110. This language plainly evinced the Board's intent to newly engage with his arguments for relief under the proper legal standards and write a new decision articulating a freestanding resolution of those contentions. See 539 F. Supp. 3d at 267.

Moreover, the Board's letter to Machado nowhere warns of the tradeoff that the government seems to suggest, whereby Machado would empower the Board to stake its new decision on its prior reasoning if he relied on his prior submissions. See AR 109-11. To the contrary, the Board's letter makes clear that it would undertake a renewed review of Machado's application "even if [he] cho[se] not to contact the Board." Id. at 110. Depriving Machado of a

20

fulsome explanation for the Board's decision because he <u>did</u> contact the Board would turn the logic of this promise upside down.[8]

I therefore proceed to review the Board's reasoning in its 2022 decision only. Machado makes four distinct arguments challenging that decision, each of which I address in turn.

### A.     <u>10 U.S.C. § 1177</u>

Machado first argues that the 2022 decision is arbitrary and capricious because the Board wholly ignored his contention that his separation failed to comply with 10 U.S.C. § 1177.

Section 1177 requires that a servicemember "who has been deployed overseas in support of a contingency operation . . . during the previous 24 months" and is diagnosed with PTSD or TBI must "receive[] a medical examination to evaluate a diagnosis of [PTSD] or [TBI]." 10 U.S.C. § 1177(a)(1). That examination must "assess whether the effects" of PTSD or TBI "constitute matters in extenuation that relate to the basis for" the servicemember's less-than-honorable separation. Id. § 1177(b). To that end,

---

[8]     Even setting the <u>Kennedy</u> settlement aside, the Board's silence on whether it incorporated its prior materials by reference, especially given Machado's explicit preceding statement to that effect, independently suggests that it did <u>not</u> take the same approach to drafting its decision as Machado did to his supplemental submissions. This divergence is all the more likely given the government's acknowledgment at oral argument that each of Machado's reviews was conducted by an entirely different panel of Board personnel.

the statute provides that such a servicemember "shall not be administratively separated under conditions other than honorable, including an administrative separation in lieu of court-martial, until the results of the medical examination have been reviewed by appropriate authorities responsible for evaluating, review, and approving the separation case." Id. § 1177(a)(2).

Before all three panels of the Board to review his case, Machado argued that the Army failed to consider whether his positive screenings for PTSD and TBI constituted "extenuating circumstances" within the meaning of section 1177. See AR 31, 287, 492. Now to this Court, he additionally claims that he was never afforded the precise type of examination required by subsection 1177(a)(1) in the first place and that the Board neglected to address that failure in its most recent decision.

Machado's argument that the Board overlooked the first of these contentions is plainly correct. Without fail, Machado raised the Army's duty to consider his PTSD and TBI diagnoses as extenuating circumstances under section 1177 at every stage of proceedings before the Board, including in his supplemental submission in 2021. See id. at 31; see also id. at 287, 492. Yet there is no mention of the issue anywhere in the Board's 2022 decision. See id. 1-11. Not once is section 1177 even cited, much less the merits of Machado's related argument addressed. See id.

22

The government's only response to this gap in the Board's reasoning is to point to two references to section 1177 in the Board's 2018 decision, but as explained above, that decision does not bear on the rigor of the Board's analysis in 2022. I can therefore only conclude that the Army's dismissal of this argument sub silentio was arbitrary. See Poole v. Harvey, 571 F. Supp. 2d 120, 125 (D.D.C. 2008) ("[T]he [review board] must respond to all non-frivolous arguments raised by the applicant. If the [board] does not respond to non-frivolous arguments, the [board]'s decision is arbitrary."); cf. Doe v. Emmert, 2025 WL 915700, at *9 (D. Mass. Mar. 26, 2025) ("By failing to acknowledge or respond to Doe's arguments," the review board "failed to adequately" explain its adverse decision on his discharge-upgrade application.).

The same cannot be said about Machado's claim that the Army neglected to provide him with the medical examination required by section 1177 to begin with, however. Machado never appears to have made this argument below, instead seemingly raising it for the first time in this Court. In fact, in his initial application to the Board, he acknowledged that he "did receive a Mental Status Evaluation in May 2014 in which he screened positive for TBI and PTSD," arguing only that the appropriate authorities failed to consider whether those conditions "constituted matters in extenuation." AR 492 (emphasis added). And he continued to stand by that

characterization of his position before the panel of the Board that reviewed the initial decision. See id. at 286 ("We incorporate by reference our previous memorandum and evidence submitted in support of Mr. Machado's initial application for records review."). Only now, in this Court, does Machado argue that the evaluations he received prior to separation failed to satisfy section 1177 because they were tailored to the wrong kind of discharge.[9] But the Board cannot be accused of arbitrarily or capriciously resolving an issue that was never presented to it. See Mount v. DHS, 937 F.3d 37, 43 (1st Cir. 2019); see also Collins v. Esper, 2018 WL 1399299, at *6 (D. Mass. Mar. 20, 2018) ("Because [the discharged servicemember] failed to raise this argument in his . . . application, it does not provide a basis for reversal.").

That limited waiver aside, however, the Board was unequivocally informed of Machado's core contention invoking section 1177—that his PTSD and TBI diagnoses were never considered as potential "matters in extenuation" affecting his discharge—and failed to address it. See 10 U.S.C. § 1177(b). That shortcoming requires remand.

---

[9]    Machado claims that the Army eschewed section 1177 by medically examining him pursuant to Army regulations that govern involuntary separations rather than those pertaining to servicemember-initiated departures. Given the Board's other errors, I need not determine whether this distinction has merit or is merely a clerical "distinction without a difference," as the government contends. See Doc. 29 at 5.

24

## B.    Liberal Consideration

Machado next contends that the Board failed to give his application liberal consideration as required by 10 U.S.C. § 1553(d)(3) and the Hagel, Kurta, and Wilkie Memoranda.

"[L]iberal consideration" is a "lenient evidentiary standard," one "that is not strict or literal." See Bussey v. Driscoll, 131 F.4th 756, 762-63 (9th Cir. 2025). If a servicemember shows that a mental health condition like PTSD or TBI "may reasonably have existed at the time of discharge," it must be "liberally considered as excusing or mitigating the discharge." Kurta Memorandum ¶ 16. To the extent that evidence in a servicemember's record may "reasonably support more than one diagnosis," it must be "liberally construed" as evidence of one that "warrant[s]" relief. Id. ¶ 17. At bottom, this relaxed standard requires review boards to "resolv[e] all . . . doubts and inferences in favor of" the servicemember. Bussey, 131 F.4th at 762-63.

At minimum, this standard necessarily requires the Board to consider all the evidence that a servicemember submits pertaining to relevant mental health conditions. See id. (remanding where the Board "did not consider" evidence of PTSD's contribution to servicemember's misconduct); see also Jeanpierre v. United States, 176 Fed. Cl. 11, 18 (2025) (listing examples of "evidence outside . . . the four corners of the service record" that review boards "should consider"); cf. Mahoney, 99 F.4th at 36-37 (affirming denial

25

where review board "considered" the servicemember's medical evidence and "took into account" his evidence supporting other mitigating factors). Indeed, a failure by the Board to consider the servicemember's best evidence altogether would fall short of even an ordinary administrative standard of review, much less the "liberal consideration" standard. See Bussey, 131 F.4th at 763 ("The Board here did not consider, let alone under a lenient evidentiary standard," the impact of PTSD on the misconduct at issue. (emphasis added)); cf. Associated Fisheries, 127 F.3d at 109 ("An agency rule is arbitrary and capricious if the agency . . . failed to consider pertinent aspects of the problem . . . .").

Machado trains his attack on the Board's analysis of Kurta Questions 3 and 4, identifying three aspects of the Board's answers to these questions that he claims demonstrate its failure to apply liberal consideration. As summarized above, the Board answered Kurta Questions 3 and 4 in the negative. AR 9. In two sentences of reasoning under Question 3, the Board concludes that Machado's charged misconduct—in the Board's words, his "severe physical assaults"—could not be excused or mitigated by PTSD or TBI because that conduct is "not part of the natural history sequelae of PTSD, TBI or other behavioral health conditions." Id. In its similarly cursory discussion of Question 4, the Board states only that it "concurred with the opinion of the Board's Medical Advisor . . . that the available evidence did not

support a conclusion that any of the applicant's medical conditions of TBI/PTSD outweighed the unmitigated basis for applicant's separation." Id.

Taking his examples in turn, Machado first claims that the Board erroneously applied a blanket assumption that "allegations of physical harm" can never be excused, mitigated, or outweighed by PTSD or TBI. Doc. 17-1 at 23. True enough, adopting such a categorical rule would be inconsistent with the Kurta Memorandum, which expressly contemplates a case-by-case inquiry. Kurta Memorandum ¶ 26(k) (noting that "[r]elief may be appropriate" even for "significant misconduct" when "sufficiently justified or outweighed by the facts and circumstances"). But the Board's explanation here does not betray such an assumption. The Board did not conclude that violence could never be excused, mitigated, or outweighed by PTSD or TBI in any case; rather, it stated that "Applicant's severe physical assaults that were the basis for applicant's separation" were inconsistent with "the applicant's medical conditions of TBI/PTSD." See AR 9 (emphasis added). This phrasing appears to reflect the Board's particularized conclusions about Machado's conduct and condition, not its application of a categorical rule.[10]

---

[10]    At oral argument, Machado's counsel intimated that the quoted language is boilerplate, ubiquitously found in the Board's decisions on similar applications. My reasoning above might differ if the record contained evidence to support that argument.

27

Machado's second example is more availing. Machado contends that the Board straightforwardly demonstrated its inattention to liberal consideration by altogether ignoring his medical evidence, including Dr. Dixon's report and affidavit as well as the VA's eligibility and service-connection decisions. This characterization is hardly an overstatement. The Board's decision indeed omits any mention of Dr. Dixon's medical opinion whatsoever. See id. at 1-11. And while the decision at least acknowledges the VA's decisions, it stops short of addressing their substance, instead merely reiterating the undisputed fact that the Board is not bound by them. See id. at 10. Nowhere does the Board explain why, notwithstanding its structural independence, it did not consider the VA's medical opinions for their informative value regarding Machado's condition. See id. at 1-11.

The government's only response to this vacuum of engagement is to gesture at the Board's review of this evidence in its 2019 decision denying Machado relief. See id. at 281-84. But again, as discussed, it was incumbent on the Board to reexamine all of Machado's evidence anew per the Kennedy settlement. See 539 F. Supp. 3d at 267. As far as one can tell from the 2022 decision, the Board never substantively revisited Machado's medical evidence at all. That failure to even address Machado's medical evidence, much less "wrestle with or seek to explain why these medical opinions should not be followed," falls far short of "liberal consideration." LaBonte v. United States,

28

2023 WL 3197825, at *9 (Fed. Cl. May 2, 2023); see also Bussey, 131 F.4th at 763; Jeanpierre, 176 Fed. Cl. at 32-33.

Relatedly, for this third example, Machado points to the Board's unexplained reliance on its own medical advisor's opinion of Machado's condition over a plethora of contradictory evidence in the record. In fact, as previewed, the medical advisor's opinion was the sole authority cited by the Board in support of its adverse answers to Kurta Questions 3 and 4. See AR 9 ("It is the opinion of the Board's Medical Advisor that" Machado's condition does not excuse or mitigate his discharge, and "the Board concurred with the opinion of the Board's Medical Advisor" that the condition does not outweigh the discharge.). As Machado points out, all the other medical evidence in the record uniformly disagreed with the medical advisor's conclusion, including the medical opinions of Dr. Dixon and the VA as well as the scientific literature on the nexus between PTSD and IPV. See id. at 286-315, 431-48, 463-70. The Board's decision lacks any explanation as to why it discounted all this evidence in favor of the medical advisor's opinion. See id. at 1-11.

As with his second example, Machado is correct to cry foul. It is the "antithesis of 'liberal consideration'" to take the "narrow approach" of "simply adopt[ing] the Army psychologists' opinions" without critically engaging the countervailing evidence in the record. Bussey, 131 F.4th at 763 (quoting 10 U.S.C. § 1552(h)(2)(b)). While even under this servicemember-friendly

standard the Board may permissibly weigh unfavorable evidence more heavily, the Board's mandate to construe evidence in the servicemember's favor where possible at the very least requires it to explain itself when it nonetheless discounts the servicemember's best evidence. See 32 C.F.R. § 70.8(e)(3)(ii)(B)(2), (6)(ii)(B)(2). The Board failed to do so here.

In sum, Machado has established by way of his latter two examples that the Board neglected to liberally consider his application in reaching its 2022 decision. While the decision prefaces many of its conclusions with dependent clauses featuring the phrase "liberal consideration," see AR 6, 9, 11, the sparse substance of its reasoning demonstrates anything but. See Thomas v. United States, 175 Fed. Cl. 47, 69 (2025) ("[W]hile the Board paid lip service to the requirement that [the servicemember]'s claims be given liberal consideration, in practice it failed to actually do so."). On remand, the Board must carefully consider Machado's evidence—especially the medical opinions of Dr. Dixon and the VA—and, to the extent that it remains unmoved, explain why each piece of his evidence is unpersuasive.

## C.    **Post-Service Rehabilitation**

Machado also argues that the Board's decision was arbitrary and capricious because it neglected to address evidence of his rehabilitation following his separation as required by the Wilkie Memorandum.

To reiterate, the Wilkie Memorandum sets out "standards" that review boards should use to "determine[e] whether relief is warranted on the basis of equity, injustice, or clemency." Wilkie Memorandum ¶ 1. The memorandum identifies eighteen kinds of evidence that boards "should" consider "as applicable." Id. ¶ 7. Among them are the servicemember's "[a]cceptance of responsibility, remorse, or atonement for misconduct," "[m]eritorious service in government or other endeavors," "evidence of rehabilitation," and "[c]haracter references." Id. ¶ 7(g), (k), (l), (p).

As examples of overlooked evidence, Machado specifically cites his "post-service mental health treatment, lack of a criminal record, stable marriage, volunteering, and other rehabilitation" as demonstrated by character reference letters, statements from his mental health providers, Dr. Dixon's report and affidavit, and his own testimony. Doc. 17-1 at 23. Machado contends that the Board's decision does not engage with any of the above.

The government responds by pointing to one paragraph in the "Response to Contention(s)" section of the Board's decision. See AR 10. There, the Board acknowledges that Machado "contends obtaining employment and volunteering in the community" and proceeds to restate the principles guiding its consideration of "post-service factors" in evaluating discharge upgrade applications. Id. The Board reserves any explanation of how those factors apply in Machado's case to the paragraph's final sentence: "In this

31

case, the Board determined that the applicant's post-service accomplishments do not warrant any discharge change owing the [sic] serious nature of the discharging offenses." Id. Additionally, the Board also provides at the outset of its decision a brief summary of the post-service evidence that Machado supplied: "The applicant states obtaining employment and becoming a valuable member of the community. The applicant is going to mental health treatment, volunteering with multiple veteran's organizations, and providing support to other veterans." Id. at 5.

The First Circuit confronted a similar challenge in Mahoney, in which a former Navy servicemember contested a discharge-upgrade denial by the Navy's counterpart to the Board. See 99 F.4th at 29. In the original administrative decision on appeal, the Navy's board acknowledged the servicemember's evidence of post-service rehabilitation, noting the "numerous advocacy letters submitted on [his] behalf" and that it "considered [his] post-service achievements, such as being sober since 2006, graduating from college, as well as [his] involvement as an active church member and community volunteer." Admin. Rec. Index ICO Daniel R. Mahoney at 3, Mahoney v. Del Toro, 2023 WL 3587285 (D. Mass. May 22, 2023) (No. 22-cv-11074), ECF No. 17-1. In weighing those facts in its analysis, however, the Navy's board bundled them with the rest, stating only in general terms

32

that it "weighed all potentially mitigating factors" and reached its decision "after consideration of [his] contentions and mitigating factors." Id. at 2, 4.

On appeal, the district court rebuffed the servicemember's claim that he was entitled to "a more detailed explanation as to why those [post-service] factors were not sufficient to recharacterize his discharge," concluding that "the level of explanatory detail in the opinion is sufficient under the circumstances to withstand review under the APA" because it contained "sufficient information from which the Court [could] 'conclude that [the Board's decision] was the product of reasoned decisionmaking.'" Mahoney v. Del Toro, 2023 WL 3587285, at *10 (D. Mass. May 22, 2023) (third alteration in original) (quoting Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983)). The First Circuit affirmed, discerning no error in the Navy board's account for the servicemember's post-service evidence. See Mahoney, 99 F.4th at 37.

Standing alone, this Board's treatment of Machado's post-service evidence is susceptible to the same conclusion. Like in Mahoney, the Board provided a brief summary of the post-service evidence that Machado supplied. See AR 5. And arguably, the Board's analysis of this evidence is even more transparent than the Navy board's assessment in Mahoney— rather than vaguely alluding to an unspecific assemblage of "mitigating factors," the Board directly addresses "the applicant's post-service

33

accomplishments" and notes that they "do not warrant any discharge change" because of "the serious nature of the discharging offenses." Id. at 10. Adhering to the low bar that the First Circuit affirmed in Mahoney, this statement would thus seem to supply "sufficient information" from which I can conclude that the Board arrived at it through "reasoned decisionmaking." See Mahoney, 2023 WL 3587285, at *10.

That said, under the circumstances, the Board's brevity may nonetheless be its downfall, as the lynchpin of its explanation for discounting Machado's post-service conduct is the outsize weight it places on the "serious nature" of Machado's misconduct—precisely the characterization called into question by the Board's inadequate engagement with the evidence of Machado's mental health conditions above. It follows that this conclusion, which apparently hinged on the Board's understanding of those conditions and how they affected Machado's conduct, will necessarily require revisiting once the Board has corrected its underlying errors. Accordingly, the Board must reevaluate its analysis of Machado's evidence of post-service rehabilitation on remand as well.

## D.   **Procedural Due Process**

Machado finally argues that the Board's decision violated his procedural due process rights under the Fifth Amendment because it failed to apply the correct legal standards, address all the arguments he presented,

34

and discuss the evidence above. See U.S. Const. amend. V; see also 5 U.S.C. § 706(2)(B). The threshold for satisfying constitutional due process is far lower, however. "[A] party's procedural due process rights are respected so long as the party is afforded adequate notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Bos. Redevelopment Auth., 838 F.3d at 50 (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). Machado does not contend that he lacked notice of the Board's proceedings (nor could he, having initiated them). Neither does he argue that the Board failed to abide by its review procedures or that those procedures somehow impeded his ability to meaningfully and promptly make his case for relief. Instead, he asks me to infer constitutional deficiency of process from the Board's defects of reasoning. But legal error is not always the fault of deficient process, and Machado offers no reason to suspect that some inopportunity to be heard by the Board is to blame for its mistakes in this case. Cf. Doe, 2025 WL 915700, at *12 (determining that a servicemember's procedural due process claim failed where he "ha[d] not specified what additional procedures, in his view, due process requires"). Machado has accordingly failed to establish a violation of his procedural due process rights.

## IV.  <u>CONCLUSION</u>

Per the foregoing, I set aside the Board's 2022 decision and remand Machado's case for further proceedings consistent with this order. On

remand, the Board shall substantively address Machado's arguments under 10 U.S.C. § 1177; carefully consider the medical evidence he has submitted; explain its reliance on its medical advisor's contrary view to the extent it continues to invoke that opinion; and reexamine Machado's evidence of post-service rehabilitation in light of its reasoned responses to Kurta Questions 3 and 4. Consistent with the Department of Defense's governing regulations, see 32 C.F.R. § 70.8(e), the Board's next decision must detail its reasoning in sufficient depth to discern its proper application of liberal consideration.

Machado's motion for summary judgment, Doc. 17, is granted, and the government's cross-motion for summary judgment, Doc. 25, is denied. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

March 26, 2026

cc:    Counsel of Record

36